My name is Susan Jane Brown with the Western Environmental Law Center. I am representing the Appellants' Alliance for the Wild Rockies in this case. I would like to start off by reserving about four minutes for rebuttals, if I may. Okay. This case is about whether or not the plaintiffs have met the standard for the issuance of a preliminary injunction. And as you've seen from the brief, there is a question about whether or not which standard applies to this case. And it is plaintiff's or appellant's position that we have met both tests in this case, and therefore a preliminary injunction should have issued from the district court. So I'd like to go ahead and begin by talking about the merits of this case, which is a foundational requirement for either test of issuance of a preliminary injunction. Can I interrupt with a factual question? Please. This is of some trouble to me, and I may have just missed this in the record, but it's not clear to me the current state of logging of this project. So I don't know whether in the time between August and the close of the season of last year, we saw a 90 percent completion of logging or a 10 percent completion. I don't know if that's in the record. Can you help me with that? It is not in the record, Your Honor. What I understand from my clients is that logging was underway until the weather shut the operation down sometime, I believe, in October or November. But I have not had an update from the Forest Service or Department of Justice about how much has been logged. But it is my understanding that the sale is not complete yet. So I suppose it's possible that almost all of the logging has been completed. It's possible. My understanding is that that's not the case. And we can certainly touch on mootness if that's your concern. I'd be happy to discuss that. Well, how much has been completed has a lot to do with whether a preliminary injunction should issue. Yes, Your Honor. And I apologize, but I do not have that information. Well, the government may or the two of you may be able to submit us a letter after argument if that becomes something that we think we need. Sure. Yes, Your Honor. So I'd like to go ahead and begin with the question on the merits. And there are four substantive claims here. The first being whether or not the revised Land and Resource Management Plan, or LRMP, is in fact operable in this case. The site-specific project, the Rat Creek Post Fire Salvage Sale, purports to tier to this revised LRMP. However, at the time that the site-specific project was implemented, the revised LRMP was not in fact final. And so it is our position that you cannot, according to the National Forest Management Act, you cannot implement a site-specific project until the revised LRMP to which it tiers is in fact final. Now, could they have tiered this project to the forest plan, management plan, that the 2009 plan was to replace, that is to say the one that was still in effect? Yes, Your Honor. And they made no attempt to do that? They did not do that. In fact, the record specifically says that they tiered to the revised LRMP. And do you argue that they could not have tiered this project to the earlier plan? No, that is not our position. We've never argued that. In fact, that would be the logical solution for them in this case. No, but what I'm after is was this harmless error in the sense that, I mean, could they have simply referred to the earlier plan and said it's final to the earlier plan and gone on about their business? They could have done that, but I do not believe that because they failed to do that, that it is harmless error because what we have here is a situation where my clients have been precluded from fully fleshing out the administrative record in their challenge to the site-specific project because it is unclear what the actual guiding principles of the forest plan are because that forest plan, the revised forest plan, was not final. Do we have in the record the earlier plan, the one that it should have been tiered to in your view? We do not because it was not at issue because it wasn't in front of the Forest Service when they made their decision to implement the site-specific project. Okay. And I guess I'll ask the Forest Service whether it contends that it could have tiered it to the earlier plan, and if so, why is it not in the record for them to make a harmless error argument? Okay. Thank you, Your Honor. So the National Forest Management Act at 16 U.S.C. section 1604 sub B states that the Forest Service must, quote, provide for public participation in the revision of land management plans. And revised land and resource management plans do not become effective until 30 days after the completion of public participation in the revision process. And that is found at 16 U.S.C. section 1604 J. And is public participation defined anywhere? The statute at 1604 D does talk about, it says the public process includes but is not limited to a variety of things including public meetings, publication of the draft document, that sort of thing. But does it include the appeal process within that concept of public participation? The statute does not specifically list the administrative appeals process, but the statute did direct the Forest Service to implement regulations that implement that statutory requirement. And those regulations are found at 36 CFR section 217. And we cited those regulations extensively in our brief. So do those regulations in any way define public participation as including participation in the appeal process? There is no, in the regulations in the definition section, there is no definition for what public participation is. But the Federal Register notice implementing the regulations does discuss public participation as being foundational to implementing these sections of NIFMA. And, in fact, the district court in Native Ecosystems Council v. Rees specifically found that the administrative appeals process at 217 was part of the public participation process contemplated by the statute. What case is that? Native Ecosystems Council v. Rees. Is that a district court case? Yes, it is. And I can, the citation is 212 F. Sutts 2nd, 1227, District of Montana, 2002. Sometimes those district court opinions can be very persuasive. Yes, Your Honor. I fully agree. And in this case, I would argue that it is the statute's decision. How about the district court order in this case? What's that? How about the district court order in this case? I will refrain from arguing on that. But it is our position that the Rees case is directly on point with the factual situation in this case. Although the time periods were a bit different in Rees and this present case, the exact same issue was before the court, i.e., you've got a revised forest plan that has been sitting out there going through the administrative appeals process. The Forest Service tries to implement a site-specific project without resolving the administrative appeals of the revised forest plan. And the district court said no. In fact, NIFMA actually requires the Forest Service to complete the public participation process on revised forest plans, i.e., complete the appeals process by issuing a decision on appellant's appeals before you can implement site-specific projects that incorporate those standards. And I assume there's no question about what the public has a right to file appeals. That is to say, members of the public are filing these appeals, these appeals which were not finally dealt with at the time this project was implemented. Yes, Your Honor. So we are talking about public participation in those appeals. They're doing it. Yes. They are doing it, but that process is not yet complete. Well, the question is whether or not that's a requirement for that to be completed before the action can be being filed. Yes, Your Honor. That's the question. Yes, Your Honor. And we argue in our brief that the regulations do, in fact, require that completion before the revised project or revised plan becomes final. And we also argue that the RDD says no. I have to say it doesn't make a lot of sense to me to have a structure that says you can rely on a non-final plan that may be changed after you've taken your action. So I'm having trouble figuring out that it would be a sense. Unless the wording pushes me to it, I have trouble concluding that it's complete until the appeal is complete. Yes, Your Honor. Your time is going to run on you. Well, in district court cases sometimes, unless you file a stay pending appeal, the matter goes forward once the district court has rendered its decision. So even though, you know, it may be reversed, the action still takes place unless there's a stay. So an appeal process doesn't necessarily mean that everything stops. Correct. And that is sometimes that can be the case in district court proceedings. But in administrative proceedings, like we have here, where the regulation or statute requires the exhaustion of administrative remedies, then that underlying decision is rendered inoperable until the exhaustion of those administrative remedies has been made. I don't have anything that says that except for a district court case. We don't have a regulation that says that it's not final until the appeal process is final. Well, because the Forest Service regulations require you to exhaust your administrative remedies before you can go to court under Darby v. Cisneros, then the underlying decision is rendered inoperable until that administrative exhaustion process is completed. So I would argue that under Darby, and there's also another case that I found preparing for argument, which I'd be happy to submit a 28-J letter for, called National Parks and Conservation Association v. DLM from this court, 586 F. 3rd, 735, 9th Circuit, 2009, which addresses specifically this issue, but in the context of the DLM and its regulations. I'm sorry. Could you give me that citation one more time? Sure. 586 F. 3rd, 735 at 740 through 741, 2009. And what do you say the holding is of that case? I understand you said it's the DLM, but what's the holding? The court looks at a record of decision and says that the record of decision never became effective and cannot serve as the agency's final action. And then it quotes from the Administrative Procedure Act, agency action otherwise final is final whether or not there's been presented or determined an application for any form of reconsideration or, and this is the key part, unless the agency otherwise requires by rule and provides that the action, meanwhile, is inoperative for an appeal to superior agency authority. And then it cites the APA, which is 5 U.S.C. Section 704. Does the Forest Service have a rule that says? It does. You don't know what I'm going to ask you. So what did you think I was going to ask? If the Forest Service has a regulation or rule that requires the decision or the appellants to exhaust administrative rights. That wasn't what I was going to ask you. I'm sorry, Your Honor. I was going to ask you if the Forest Service has a rule that says if decision is not final until the appeal has been decided. Yes, it does. Okay, and what's that regulation? And this is in the regulations that are appended to plaintiffs' opening briefs. Okay. Let's see. I don't want you to use your rebuttal time, so maybe when you come back you can. I will give you that. Okay. Thank you, Your Honor. I agree with that. Given the number of issues here, it's, I think, readily apparent that 15 minutes per site is probably not enough. So let's just keep talking until we've pretty much exhausted what we need to do and we'll make sure the Forest Service has as much time as it needs. So I think 15 minutes is probably budgeted a little too stingily. Okay. Could I ask you why you think that an EIS was required here? Obviously, the Forest Service didn't think so. It prepared only an EAA. Right. Why, in your view, is it required? Well, the NEPA regulations talk about, well, let me back up a little bit. This court in Blue Mountains Biodiversity Project v. Blackwood held that, quote, to prevail on a claim that the agency violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will, in fact, occur. It is enough for the plaintiff to raise substantial questions whether a project may have significant effect on the environment. And this is a relatively low threshold for the preparation of an EIS. So then what the court in Blackwood did is look to the NEPA regulations at 40 CFR Section 1508.27. And this is the significance question. And there are ten significant facts, significant factors. And if any of those factors are present, then an EIS should have been prepared. And in this case, we have argued that there are several significant factors that were triggered, including controversial and unknown effects, threatened violations of law, and actions that may establish a precedent. And all of those are specific sub-points of 40 CFR 1508.27. Now, you didn't do a sort of... One of the things that the Forest Service argues here is that the project here is fairly small. Yes. The number of acres, fairly small. The percentage of the overall burn, about 6%, fairly small. I had my law clerk look up litigated cases in which an EIS either had or had not been prepared. And I guess I want the Forest Service to be listening to this. An EIS has been prepared for some post-fire salvage logging cases with acreage about this size and sometimes a little bit less. Yes, Your Honor. And I can't see that the environmental consequences kind of going in on those acreages that are more or less the same here are materially different or less than here. So I'm having trouble figuring out why the Forest Service can just say with this amount of acreage it doesn't have to do with an EIS. Is the number of acres a relevant factor to whether or not an EIS should be prepared? I'm not talking exclusion. I mean, I understand if it's excluded because there are really very, very few that's excluded. But the line between EA and EIS is a little fuzzier. Yes. Can you help me out with the relevance, if any, as to the number of acres involved in the project? I think as you point out, Your Honor, the number of acres is a factor, but it's not determinative. And as we argued in our briefs, you can have a relatively small number of acres, and I would dispute that about 1,200 acres, although it sounds sort of small, it's not necessarily small. Size doesn't necessarily matter. And what we should be looking at are, again, those ten significance factors and whether or not those environmental conditions or factors or other factors are present. And that's what we have argued here is that because we have several significance factors that have been triggered, then there is a question about whether or not this project will, in fact, have significant environmental impacts. So you're challenging the Poncy finding, that determination? Yes. Yes, Your Honor. And so the question here, then, and under this Court's precedent in Blackwood, whether or not an EIS is prepared is not plaintiffs proving that significant effects will, in fact, occur, but the question that they may, in fact, occur. And that's what we've argued here is that because of all of these significance factors, because of the inadequacy of the agency's analysis, there are significant questions about whether the or serious questions about whether or not those significant impacts will occur. You may have trouble answering this question, and if you want to dodge it, I fully understand. I found the timeline of this case interesting. You file suit two days after the EA is signed, and you and the government agree on an accelerated briefing project, and for some reason the district judge is really irritated and gives you the back of his hand. What was going on in the district court that the district judge just decided, you know, I don't want to do this. It's too much work. I don't have enough time. Go away. That's how I read his order. What was happening? I will respectfully dodge that question. Okay. Because I have no insight into what the judge was thinking, Your Honor. Okay. Fair enough. Smart answer. Well, and I gave you permission ahead of time. That's a fair result. A fair advantage. You talk about the finding of no significant impact. What do you make of salvage cases where at least the Forest Service argument is that there's a significant impact either way, that if you don't do salvage logging, you end up with the sort of environmental degradation that occurs because you didn't act. And so the Forest Service ends up a little bit between a rock and a hard place in terms of impact. And I know you rely perhaps on the BEXTA report saying that's just mistaken. Is that the answer, the only answer, that it's just simply factually incorrect that to do nothing can cause a significant environmental degradation? Your Honor, I think we can only deal with the facts in this specific case. And certainly the BEXTA report does cast doubt on the conclusion that post-virus salvage logging has, you know, has no environmental impacts. I think in this case, the Forest Service's analysis or the rationale behind why I wanted to do this project was that we basically need to generate some funds to do some other work in this area. And they're talking about, for example, replanting and doing some treatment of mistletoe, which is a pathogen that affects trees. And so we – and if we don't get the money from the salvage sale, we can't do that work, and that will have an environmental disadvantage or will harm the environment. And although we did not address that issue and that issue isn't in front of the court here, we have argued that because the government has argued, well, if we can't do this project, our irreparable harm is economic in nature. What we have argued is that there are other ways or other sources of money that you could tap into to do that sort of work. So if your environmental – if your degradation concern is that we can't do these other projects, well, you could have gotten – you can get money other ways, and the government hasn't shown that those other sources of money are not available. Let me ask about the BEX report just for a moment if I could. It seems like one of the key linchpins of your argument regarding irreparable harm is from that report, the idea that this kind of salvage logging causes irreparable harm to the parcels involved. Has the Forest Service here taken mitigation steps in response to the BEX report that this case, on a different footing than the factors the BEX report points to for the harm that comes from salvage logging? In this case, the Forest Service has employed some mitigation measures. Specifically in response to the concerns outlined in the BEX report? No, because in the – there is nowhere in the administrative record does the agency specifically address the BEX report. In fact, it's not even in the literature cited page or page – Well, whether it's cited or not, if the report says, for example, that salvage logging increases soil erosion, did this sale undertake mitigation efforts to prevent soil erosion? It did in some cases, and our concern is that it didn't address all of the recommendations from the BEX report. And as we argue in our brief, this is not a battle of the experts. The Forest Service is free to disregard those recommendations, but what we have argued is that under NEPA, which requires the agency to disclose and discuss scientific controversy, the agency has not made that disclosure and has not discussed this is what the BEX report says, this is what we're going to do, which may or may not differ from those recommendations, and here's our project. Had they done that, then we wouldn't have had a NEPA claim. But they didn't do that. They didn't say, you know, there is this other body of literature that disagrees with what we're going to do. And that's simply what NEPA requires is that mere disclosure of, hey, there's other science out there that counsels against our proposal. They can completely disregard it in their project design and implementation. But as a procedural matter, NEPA does require the agency to make that disclosure, and they simply did not do so here. But you have to get from a procedural violation to irreparable harm. Do you think you can rely on a procedural violation to get irreparable harm? Yes, Your Honor, and I would say that that's not the only thing that we have alleged. I understand that, but I do want to make clear that your position depends on moving from a procedural NEPA violation for injunctive purposes to some actual irreparable harm. You're contending there's going to be harm on the ground, not just that you've lost a procedural opportunity. Correct. And our declarations express, and the Lujan case talks about, that irreparable harm is irreparable harm to the plaintiff and not necessarily to the environment. And we argue that we have both, that my clients in this case are harmed when the post-fire, the undisturbed post-fire environment is disturbed by logging, that that harms them, that they can no longer enjoy those forests in their natural state, that the wildlife that they go there to see is affected and disturbed by that activity. So that is an actual harm to my clients from the actual act of logging. But then there is, in addition, the procedural harms as well. That's why I was asking, are you relying on your client's lost procedural opportunity as a form of irreparable harm to your clients? We're not relying on it, no. Let me ask you about the ARA business. I read the letter from Washington, D.C. to the regional forest service person saying that the emergency situation determination was made and so on, and that letter was written on July 1, 2009. The EA was dated fairly shortly thereafter. July 22, you file your complaint on July 24. I understand that the emergency situation determination by the forest service means that there's no stay of the action that's allowed to go forward simply, which I gather is why you filed suit so quickly. Yes. I'm trying to figure out what would have happened if no emergency situation determination had been made. What would have been the procedural opportunities available to you? How long would it have been stayed? I'm trying to figure out how this determination affected the course of this litigation. Can you help me? Sure. So the way that it typically works, if there's no ESD or emergency situation determination made, is that the agency would issue a decision notice and finding of no significant impact. And at that point, plaintiffs would have had, given the NISMA regulations, that decision would have been stayed pending administrative appeal. And I believe because it's an EA, I think we have 45 days to file an administrative appeal. The agency takes a certain amount of time to review those administrative appeals and then offers to meet with the plaintiff to try to resolve the administrative appeal and then finally makes a decision. And my understanding is that it's about 120 days, given the various timelines along the way, between the decision notice being signed and the soonest that the project could be implemented. And what kind of record would have been developed during the course of that administrative appeal? Well, it's tough to say, but my guess is that my clients would have spent more time out in the field gathering perhaps experts, looking at spending a lot more time reviewing the documentation that, you know, the specialist reports and that sort of thing that are put together to justify the agency's decision. So generally speaking, when given the opportunity, the plaintiffs will take that opportunity to try to resolve, to not only put together their administrative appeal, but hopefully try to resolve it and come to some sort of agreement with the Forest Service as to how the project might be able to be changed in order to be implemented with no litigation. So there was no opportunity for an appeal in this case? We can file an appeal, but there's no stay of the project's implementation. But did you file an appeal nevertheless? I think we did in this case, just because, you know, we might as well cover all of our bases. But it was filed well after litigation commenced. And what's the status of that appeal? I believe the appeal was denied. Okay. So now in the case that you cited, National Parks and Conservation Association versus BLM, on page 741, it talks about what happens when the appeal goes forward in the interim. And I've read this case very quickly. But it seems to say that once the appeal is filed and resolved, then review is of the appeal decision. It doesn't say... That's generally true, Your Honor. And that's sort of the problem that we have here, because in situations where you don't have an ESD, what we would be challenging is not only the decision document, so the DN-FONSI, but also the appeal denial. But because we don't have, I mean, because the project's being implemented and we don't yet have an appeal denial... I thought you said it was denied. It was, but well after the logging commenced. But why couldn't that be reviewed at that point? You mean the appeal denial? Uh-huh. It could be, but our concern is that we need to get into court to stop the logging that has been given the green light because of the ESD. So we can't wait the whole 120 days, or we could, but... Can I interject here? I'm confused. I thought you said that this case to us as we were trying to figure out whether or not the new forest management plan was final so that it could be tiered to, rather than an appeal of the decision of this particular project. I was confused. I just want to make sure we're... Well, I had a different, I thought you cited it for the fact that the agency decision was not final because it hadn't been appealed yet. For the, that the revised LRMP is not final. And what I think you're hitting on is that I think that there is a question here about whether a challenge to a forest plan standard, which we haven't talked about, the snag retention standard, whether or not that particular claim is right given that the forest plan is not yet complete or has not been final. So now I'm confused as to why you cited this case to us then. Well, I cited the case to you for the proposition that the revised forest plan cannot be final until the administrative appeal of that forest plan is complete. Because this case is talking about a record of decision. Right, which is, for the revised forest plan, there was a record of decision because it was done within EIS. Okay, why don't we hear from the government unless anyone else has any questions at this time. And I suspect we want to hear from you again. This case has enough issues that we're just talking as long as we need to talk. Okay, thank you, Your Honor. May it please the Court, I'm John Arbeb from the Department of Justice on behalf of the Forest Service. I know there certainly have been a lot of questions raised. I can just go right to the ones that seem to be the most significant to the Court and try to address them. First, Judge Mossman was wondering about the current status of the project of the Rat Creek Salvage. The latest information I have, which is as of this time last week, is that the project is about 49% complete. About 49%? Well, exactly 49% complete. And the Court may recall that there's also a temporary road building element of the project, which called for seven miles of temporary roads to be built. As of now, five out of the seven miles have been, temporary roads have been put in. So in terms of a mootness problem, at least at this point of the case, I don't believe there's any reason for the government to file a suggestion of mootness. Okay. The first substantive claim that I think questions arose about are the plaintiffs' claim that they're likely to succeed on the that this project could not be implemented, the Rat Creek Salvage could not be implemented because the revised forest plan was not yet final and this violates the public participation provision of NAFMA. Do you have a case that holds that a project may be tiered to a forest plan that has not been finally approved after appeal? Your Honor, I don't have a case specifically stating that, but I do have arguments for why the plaintiffs' claim is not likely to succeed on the merits. And since we're here on a preliminary injunction, that is what they must demonstrate. Yeah, so you have no case that holds your way, but you're trying to convince us that that is nonetheless the law. No, Your Honor, I'm trying to convince you that the plaintiffs' interpretation of the public participation provision of NAFMA is not likely to prevail on the merits. Why did you say no to me? I thought that's what I was saying. Here's how I understand the forest management plan issue, and if I don't understand it correctly or if you wish to persuade me to understand it differently, please feel free. But as I understand it, here's the argument that the plaintiffs are making, that this project is tiered to or is dependent upon the 2009 forest management plan, which at the time this project was approved with the EA, that plan had not been finally approved because there were still appeals pending. Or no appeals yet. No, I think there were appeals pending. There were appeals pending to the forest plan that might or might not have been appeals to the project. And so the argument is then, listen, you can't tier to that until it's an approved plan, and your argument is, oh, well, yes, we can. I mean, that's the argument, right? I don't think that that's precisely the plaintiffs' argument, and I don't want to... Well, assume for a moment that that is their argument. What would be your response to such an argument? My response would be that if that is a NAFMA claim, it's not likely to succeed on the merits because it turns on...it entirely depends on what the term public participation in Section 1604B means. And the notion that public participation includes and continues until all administrative appeals of revised forest plans have been decided... Including appeals brought by the public, of course. Those are typically the administrative appeals that are brought by parties in the public who disagree with the decision that was made approving a revised forest plan. Correct. And my argument is that that is not an interpretation of 1604D that is likely to prevail on the merits for two reasons. One, it does not fit comfortably within the actual statutory language of 1604D. And with all due respect, I still don't think that the plaintiffs have come forward with an interpretation of the actual statutory language that encompasses their, in my view, broad understanding of what public participation means. The second reason, as we discussed in the briefs, is that if the plaintiffs' interpretation of the statutory language were correct, two very specific Forest Service regulations dealing with forest plan appeals would not really make sense. Those are the two that are discussed in the brief that flow from Part 217 of the Forest Service regulations in 36 CFR. The first one is that the regulations plainly state that, yes, forest plans or forest plan revisions can be appealed administratively, but in the meantime, the revised forest plan shall not be stayed. So that is at least... There's a tension between that regulation and the idea that, no, a forest plan cannot become effective until all the appeals are decided. There's a great tension there that has to be explained, I think, to a sufficient degree by a party who is claiming to be likely to succeed on the merits of such a claim. The second regulation that would be inconsistent with the plaintiff's reading is the other Part 217 regulation, which says that a decision that is appealable under this part can be implemented. I may not be quoting that regulation exactly, but it's in the brief. It may be implemented as soon as seven days after the proper legal notice has been given to the public. It would be very difficult to reconcile the plaintiff's theory with that regulation because if the plaintiffs are correct, certainly a revised forest plan could not go into effect as soon as seven days after publication in the appropriate newspaper was given. Counsel, I asked the opposing counsel whether or not there was a regulation that says a decision is not final until the appeal has been exhausted, and her recollection was that such a regulation existed. Do you have a similar recollection? I do not believe that there is such a regulation. I think the regulation that the plaintiffs are citing is the exhaustion of remedies provision, which says that in the last section of Part 217, I think it's 217.18, which says that in the view of the Forest Service, a decision is not appropriate for judicial review until a party has exhausted whatever administrative remedies. But there's nothing about the finality of the decision in your view? No, Your Honor. That does not even purport to bear on the notion of what does public participation mean under the National Forest Management Act. I mean, if Congress had wanted in the public participation description in Section 1604D, Congress perfectly well could have said public participation does not end or includes exhaustion of administrative remedies with respect to a forest plan before the agency. But that's not what the section says. Could you put my nose in the Section 217 regulation that you referred to and upon which you rely? I'd like to sort of read through it with you so I understand precisely the textual analysis that you have in mind. And is that regulation in the ER somewhere? The regulations are an addendum to the red brief. Okay. And they are discussed in the red brief at pages 40. Put my nose in the language in the regulation that you think is... 40 through 41. Yes. There were two Part 217 forest plan appeal regulations that I referred to. And the first one is 36 CFR. Oh, I'm sorry. Your Honor, these regulations are discussed at pages 30, beginning on page 38 and going on to page 39 of the regulation. Could you give us the specific citation to the section of the regulations that you're relying upon? Yes. My first regulatory argument relies on 36 CFR, Section 217.3A1. And where is that in the addendum to your brief? Addendum 14, page 14. Okay. So what language do you rely on here? They're all right around those pages of the addendum. That is the regulation that permits appeal to forest plans. But if you look at Section 217.10B, that is a regulation that expressly states, requests to stay the approval of forest plans shall not be granted. And the second regulatory argument I was making is based on 36 CFR, Section 217.10A. That is the one that states that implementation of any decision subject to appeal pursuant to this part shall not occur for seven calendar days following publication of the legal notice of the decision as required in this part. That is the second regulation that really would not make sense if the plaintiff's conception of public participation. My slowness is causing problems here. I was just reading 217.10B and C because I was trying to follow up on that one. B says, requests to stay implementation of a project or activity included in such a plan, that is a plan that hasn't been stayed, will be considered as provided in paragraph C. And then it says, where a project would be implemented before an appeal decision could be issued, the appeal officer shall consider written requests to stay for limitation of that decision pending completion of the review. Was any such request made in this case? To stay, I don't believe so, Your Honor. To stay the project pending review? No, I don't believe so. Okay. And I'm sorry, then you had a second regulatory section, but I was gathering what we do now. Yes, that was 36 CFR, Section 217.10A. And that is the one that permits decisions subject to this appeal process to be implemented as soon as seven days after legal notice is given of the decision by publication typically. And that would make a lot of sense if the Forest Service had to wait. The appeal process, the appeals of forest plans certainly will take much longer than seven days. And on that point, I just want to refresh the Court's recollection that all of the appeals of this forest, this revised forest plan were decided, I believe, on October 30th, 2009, and we brought that to the Court's attention in an earlier 20th day letter. So. You've suggested that your opponent is not likely to succeed on the merits. Do you believe that your opponent has raised serious questions going to the merits? Your Honor, it's not entirely clear to me what the serious questions threshold is. I'm assuming for the moment that it's still a viable standard for issuing a preliminary injunction, which, of course, as we lay out in the briefs, I think that it is no longer a viable standard after the Winter case. And we've also provided last week further 28G authority for that proposition. But proceeding under the assumption for the moment that the serious questions test is still viable, I would make two points. One, serious questions have to be, well, they're presumably something less than likelihood of success on the merits. But serious questions, I think, means that there has to be some, perhaps not likelihood of success on the merits, but some very strong reason to think that the claim being raised is meritorious. And I submit with all respect that on this NAFMA claim, when you're advancing a position that does not fit with the statutory text, and which is quite contrary to two specific Forest Service appeal regulations, which no one is doubting of validity, I really question whether, I don't believe a serious question has been raised as to the likelihood of that claim prevailing on the merits. I would also point out that even if the serious questions test is still viable, it's a two-part test. The second part requires the plaintiff to show that the balance of hardships tips sharply. I believe the adjective is sharply in the movement's favor. I think it's somewhat relevant that in neither the opening nor the reply brief is this concept of sharply tipping addressed. Even in the reply brief, I think it's on the last page of the reply brief, the test is stated as just the balance has to tip in the movement's favor. I call your attention to the district court's order. I'm troubled by the fact that there appears to be little weigh-in at all of the equities in setting forth what the relative considerations were from the district court. How are we to read that, the gravity of the order in determining whether or not the district court considered the parties' respective positions? Your Honor, I do believe you're correct. It was a short order denying a preliminary injunction. I believe Judge Fletcher wondered what might have been going on in the district court. I don't know because I was not trial counsel. I'm just concerned that it doesn't tell us enough about how the district court weighed the equities or what the district court considered in terms of deciding that the injunction should be denied. Well, Your Honor, I think, although it's brief, a couple of things are pretty clear. One, the district judge believed, in our view correctly, that the test he should be applying is winter, not a balancing test of some kind. The other thing that's clear is that he did state why he believed the winter test was not met. The judge stated that the plaintiffs had not shown a likelihood of success on the merit. Well, he said every claim is a loser. He said, I don't see likelihood of success on the merits of the claims that are being pressed upon me in the PI context. And secondly, that I don't believe that the plaintiffs have shown a likelihood of irreparable harm. But without explanation. So there needs to be, to me, I would like to see some kind of explanation as to why the harm is not irreparable. There's absolutely no discussion. It's just kind of a conclusion. And how are we to decide whether or not the district court abuses discretion if there is no explanation? Well, Your Honor, I do grant you, Judge Rawlinson, that when I first read the district court's opinion, I was sort of wondering whether it wouldn't have been better for the judge to spell that out further. But in response to your concern, I would say that if a claim were being made here that a reason for vacating or for reversing the district court is that the district judge did not give enough of a rationale for this court in its reviewing capacity to be able to decide whether the district judge had or had not abused his discretion, that would be one thing. Well, that's a concern for me. Whether or not the argument is made by the parties, we still have an obligation to determine whether or not there's an abuse of discretion. It's difficult for me as a reviewing judge to do that if I don't know the reasons for the decision. Your Honor, I think it's the obligation of a plaintiff who's seeking the extraordinary remedy of a preliminary injunction to come forward with arguments that it wants this court to accept as having made the showing required for an extraordinary remedy. If a plaintiff is not concerned about the brevity of the district judge's opinion or rationale, then I can't be concerned? No, this court can be concerned, Your Honor, but I think the court's principal concern should be whether any of the, let's just call them errors, that are being brought up to the court of appeals warrant setting aside the judgment of the district court. We routinely set aside orders if we can't discern the basis for the orders. It's really easy for a judge to do denied, affirmed, but if we can't ascertain the reason, we can't determine whether or not an error of law has been committed or whether the judge otherwise acted irrationally. It's very difficult. I grant you that. It may have been better for a more thorough opinion to have been prepared by the district judge, but, again, I think whatever error there is needs to be addressed and brought before this court by a plaintiff who's seeking a preliminary injunction, and I do believe there's enough in the district court's order to know why he denied the preliminary injunction. Perhaps you're more discerning than I am, Dan, because there's not enough for me to know why. Do you believe the balance of hardships tips in your favor or just not sharply in your opponent's favor? Well, Your Honor, in the brief, we make it quite clear that in the Forest Service view, the balance of hardships tips strongly, clearly in the favor of letting this project proceed. And what did the district court say about that? The district judge didn't have to address that question, Your Honor, because he found that two of the other winter factors were not met. Let me ask you not as to winter but as to the merits. This is on the ARA claim. We have a letter. It's at SCR 286 and 287 from Abigail Kimball, chief. I'm not sure what she's chief of. Do you know what she's chief of? Anyway, Abigail Kimball. I believe at the time she was chief of the Forest Service. Chief of the Forest Service. That's kind of inference because it's okay. She writes a letter dated July 1, 2009, granting the request for an emergency situation determination made in a letter on June 22, 2009, and lists in support of that decision the projected loss of the government as much as $16,000 if it is delayed, and if there are no bids, potentially a loss of $70,000. And then the separate paragraph, she writes, in evaluating whether an emergency situation exists with this project, I also took note of the importance this project has on the local economy of southwest Montana. I understand the wood products yielded by this project will be a critical contributor to helping keep local mills operational. My first question is, is the effect on the economy of southwest Montana relevant to the decision of whether there should be an emergency situation determination? Your Honor, first, I know this won't be a satisfactory answer. The answer is no, but I'd like to hear it from you. Yes, first I'd like to make the largely point that so far as this PI appeal is concerned, the plaintiff is not attacking the ESD on that basis. So I don't think the court needs to... And on what basis, in your view, is the plaintiff attacking the emergency situation determination? As far as I can tell, the claim is that the primary legal claim is not the one that Your Honor is suggesting, but it's that... The claim, as I understand it, is that the emergency situation determination was erroneously granted. No, well, generally, yes, but the specific reason that it was erroneous was because allegedly ESDs must be prepared in consultation with a so-called interdisciplinary team, and there's no... Well, and there's also a claim that, hey, where's the emergency? The fire, as I'm sure you know, but you don't really like to play it on your brief, the fire took place almost two years before the declaration of the emergency. I mean, if it weren't such a bad pun, I'd say, well, where's the fire? Meaning, they allow those trees to sit there for almost two years, then all of a sudden we get a letter from the regional forest service person in July, in the summer of 2007, when the fire was at the end of the summer... Excuse me, the letter's in 2009, when the fire's at the end of 2007, all of a sudden asking for an emergency determination. The criteria available for a determination, an emergency situation determination here, would be the economic impact. I'm sure you agree that that is the criteria that would make it available, correct? Yes, the regulation says that one of the considerations is the potential economic loss to the United States. That's one of the two, and I assume that's the only one that's relevant here. Yes. And with all respect, $16,000 is chicken feed. Your Honor, the projected loss in the ESD was $70,000. As it turned out, as we point out in the context of the preliminary injunction question, the potential loss to the government was even larger than that, because as it turned out, the ESD was issued, then the project was put out for public bidding. As it turned out, as one of the declarations, I believe the Fletcher Declaration that's in the excerpts explains, it turned out that someone bid quite a bit more for the project than the forest service expected. There was $148,000 bid for the project, which represented what they call a bid premium. So in terms of the preliminary injunction analysis, the potential loss to the government, the hardship on the non-movement, is even larger than was predicted in the ESD. But how do we calculate loss here? I think if the project doesn't go forward at all, the government saves money, correct? Your Honor, it's a question, as I discussed in the brief, of the government trying to salvage something in the way of value that is a wasting asset in these dead and dying trees. If the government was interested in protecting the value of this wasting asset, why are they sitting on their hands for two years? I see a lot of these salvage logging cases, and the government tends to move, the forest service tends to move fairly fast, precisely for the reason you've given here, yet the government all of a sudden, two years after the fire, decides there's an emergency. But Your Honor, you have to keep in mind that the government, the forest service, decided that it could not authorize this project pursuant to just a categorical exclusion. It had to prepare at least an environmental assessment, which takes some time. By the time you have scoping, by the time you have a draft EA, which is circulated to the public, by the time the public makes comments, by the time a final EA is prepared, additional comments come in from the public. I understand all of that, and I've seen a number of these cases, including one with a similar acreage coming out of California where an EIS was prepared and done in a timely fashion, and away they went. This one, if the government thought this was an emergency, I don't understand why they didn't start acting in the winter of 2007-2008 after the fire. Your Honor, I believe that that's when the initial NEPA process started as quickly as could be done after the gravity of the situation was known. And when was that? Your Honor, I don't recall when the initial scoping began, but it's laid out both in the decision notes and in the environmental assessment itself. The timeline is there. It does not take very much work to prepare an EA. It requires more work to prepare an EIS, but it just baffles me that all of a sudden we're presented with a declared emergency two years after the fire. I mean, I've seen these cases before. This is the first time I've seen anything remotely like this. Your Honor, I don't think there's any claim here that the ESD was somehow invalid because of the timing with which it was invoked. I don't think you've read the Blue Brief. I mean, that's one of the things they say very precisely. They use the same sign that's on the administrator's desk at Berkeley High School where my kids used to go. Lateness on your part does not constitute an emergency on our part. Your Honor, I... I mean, that's right there in the Blue Brief. I read it. I think you probably do too. Your Honor, you've jogged my memory. A claim to that effect is made, but you have to back it up with some reason to think that the ESD in this circumstance was somehow dilatory in a way that is contrary to law and that you're likely to succeed on the merits of such a claim. It's clearly dilatory, and it seems to me, at least as I read it, based upon at least in substantial part an impermissible reason. I mean, I just see this as a misuse of the power to declare an emergency to make an emergency situation information. Your Honor, two things. First, and I think this is a correct recollection of the opening brief, to the extent that the ESD referred to the granting of the ESD in part because the local economy has been taken into account, I do not understand the opening brief to be attacking the ESD on that ground. But secondly, I think that this EA was quite thorough. It's in excess of 200 pages. It has appendices going through letters A through at least H in my recollection. This was a very thorough document that could not just be turned out in a matter of days. As I said, the NEPA requirements... The effect of this determination of an emergency situation determination was, and we've touched on this, was dramatically to change the litigation posture in this case. It meant that this login was going to go into effect immediately. It prompted, and I see exactly why this happened, two days after the signing of the EA, two days afterwards that this suit is filed. Let me make sure I got my dates correct. Okay. EA is dated July 22nd, 2009. That is, you know, three weeks after this emergency situation determination is granted. Because the emergency situation determination has been made, that means there's going to be absolutely no stay of the project. Therefore, they file a suit almost immediately. They file a suit two days later on the 24th. The district judge denies relief on August 14th, 2009, saying that he hasn't had time to review these materials. In other words, this action has put this into a posture where your plaintiffs cannot make a record that they might have been able to make by a review had this determination not been made in a situation where the district judge says, you know, I just can't do this in the time frame that you've given me. All of this is directly flowing from this emergency situation determination. Your Honor, I would make two points. First of all, I don't believe that the plaintiffs have raised a claim on which they're likely to speak to the effect that the ESD in this case is invalid for any reason. Secondly, let's... I don't speak for my colleagues. I disagree with you on this point. I think it is a flagrant violation of the statute. But my colleagues may or may not agree. Well, Your Honor, if I might press you for a moment on that point, it's clear that the Appeals Reform Act allows ESDs to be issued by the Chief of the Forest Service. Of course. And... Under very precise criteria. Well, all the ARA says is that I believe that the words are that there's an emergency situation. Do you want me to read you the language of the statute or of the CFR? Well, the CFR is a separate matter. Yes, the agency has promulgated a regulation to flesh out what that means. Well, and either it's okay under the regulation or it's not. Yes, and our point is that here the... I don't think the plaintiffs are making... Well, I take that back. The plaintiffs are suggesting that under the regulation, this project doesn't qualify. Yes. Because we don't view this... We, the plaintiffs, don't view this project as posing a loss to the federal government. Not a loss to the federal government. I will read to you the language of the regulation. The first part I think is not relevant here. I don't think anybody contends. That is, hazards threaten human health and safety. But the second one, upon which I think everyone seems to be depending, or that would result in a substantial loss of economic value to the federal government if implementation of the decision were delayed. And the letter says, well, it could be $16,000. It could be $70,000. And then it says, and in deciding whether I'm going to grant this, I also take note of the fact that the economy of southwest Montana would be greatly benefited. I don't see in this substantial loss of economic value to the government. Your Honor, the regulation doesn't set a threshold. It doesn't define what substantial means. I think reasonable minds can disagree on this point, but I think it's certainly rational for the Forest Service reviewing this specific project to come to the conclusion that we'd rather not lose $70,000 if we don't have to. We're not talking about, you know, a $10 loss, which perhaps no reasonable minds could disagree about. But I understand that you disagree with me on the point. Counsel, may I ask you about the Winter case? When I said something about the district court balancing, you said that no balancing is required under Winter. So I'm going to read you this language for Winter and ask you if you still think that's true. In Winter, page 376, the court said, in each case courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. So does your answer, do you still maintain that Winter eliminates the balancing requirement in the court? Your Honor, I think what I should have said in response to your question was that, at least in the government's view in this case, there was nothing to be balanced because, in the view of the United States, none of the four Winter factors are met. So there's nothing to balance. Perhaps if three of the factors were met or two of the factors were met. It says it must balance the competing claims of injury. Yes, Your Honor. But if, in our view, yes, you would, on appeal. Now, the petitioner, the plaintiffs are trying to say that, at least under Winter or perhaps an alternative test, the balance of hardship sits in their favor. I think it's talking about the district court, too, that you have to balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief. It's not limited to appeal. Well, Your Honor, I think I know we have to engage in some interpretation of what the district court had in mind, but I think what the district judge was saying was I'm looking at the two super important parts of the Winter test. One is likelihood of success on the merits, and the other is likelihood of irreparable harm. And I just don't see that at all in this case. So now I'm inferring. So to the extent that there are any other concerns here, I think the lack of these two outweigh whatever else might be said on the public interest or on the other elements. That's a lot of extrapolation on your part. Well, Your Honor, I'm giving you what I think is a fair reading of the district court's opinion. Certainly, this court might agree, but, again, I would go back to the point of stating, I know, Judge Rawlinson, this is probably not going to satisfy you, but if the plaintiffs believe that error was committed below in denying the preliminary injunction and one of those errors was that the district court did not flesh out for proper review how it was exercising its discretion in denying us a preliminary injunction, that's a claim that the plaintiffs should be making in their briefs here. And I just don't see that. Well, there are a lot of things you don't see in that plaintiff's brief. Your Honor, I honestly in the red... Just a moment. The case law in the courts of appeal, as you know, and you gave us a 28-J letter with some of it, has been pretty actively developing on what winter means. And I won't hide it from you that there's a case coming out of the Seventh Circuit that came down kind of in the middle of your briefing, so I don't fault you for not putting it into your briefs. It had been decided before the red brief was filed and necessarily before the reply brief was filed, a case called Hoosier Electric, a unanimous opinion written by Frank Easterbrook, which in my view probably is about the best reading of winter. That is to say preserving some of the sliding scale consistent with winter. So I just want to say that that's kind of where I am with that. I think winter is a real case and we've got to pay attention to it. And for my own sake, I'm inclined to think that Easterbrook got it about right. Assume for a moment, and I understand that you disagree with me, assume for a moment that we find, if you like, likelihood of success on the ARA claim, I would say it's a slam dunk winter on the ARA claim. Assume that that's so. Assume further that I think that there's at least a reasonable question whether an EIS should be prepared under these circumstances. Assume further that, as is ordinarily the case in environmental cases with salvage logging, that cutting of trees is considered to be irreparable harm. With all of those assumptions, does a preliminary injunction lie? I'm sorry, under which test? All of those assumptions. Under the winter test. Under the version of the winter test I just gave you, if you like, I'll read it to you, although it's probably not going to be a great surprise. This is Hoosier Energy. It's 582F3rd at 725. Judge Easterbrook writes, irreparable injury is not enough to support equitable relief. In other words, you need that, but you need more. There also must be a plausible claim on the merits, and the injunction must do more good than harm, which is to say that the balance of equity favors the plaintiff. How strong a claim on the merits is enough depends on the balance of harms. The more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief. That's Judge Easterbrook, post-winter. Well, Your Honor, I think that you could, depending on what facts you wanted to find, that testing theory could be satisfied. Well, we don't find facts. I mean, we're in a court of appeals. But I asked you, okay, assume that we find that ARA has been violated. Yes, okay. Assume that there's a reasonable chance. I can't quantify this really very precisely, but it's a decent argument that an EIS is required. I don't regard that as a slam-dunk winner, but there's a decent chance that an EIS is required. And unless preliminary relief is granted, all these trees are going to be cut down. All the remaining trees are going to be cut down. Does that warrant preliminary injunctive relief on those assumptions? You don't have to agree with me on ARA and so on. Your Honor, on those assumptions, I think the question the Court would have to ask is, what is the nature of irreparable harm to the plaintiff in this case? Cutting down all those trees. In this case. And on that point, I would fall back on what we said in the red brief, but maybe to put it in a nutshell, the interest that's being asserted by AWR and its members is in being able to enjoy this area of the Beaverhead Deer Lodge National Forest in its undisturbed state. I think the Court in irreparable harm analysis would have to take into account the fact that the project area here has been defined without challenge, as far as I can tell, without serious challenge, to be about 26,000 acres, the so-called Rat Creek wildfire area, the area in which the fire burned. The Court would also have to take into account the fact that the area that's proposed to be treated is only about 6% of that area. In other words... That's extent of harm. That's not necessarily irreparability of harm. And the 6% figure struck me as a red herring. I mean, if the project, if the entire fire were, for example, one-eighth of the extent of the actual fire here and the acreage, the same acreage was proposed for the salvage logging, it would be 48%, but it's still the same acreage. I mean, the fact that it's 6% is neither here nor there for me. The question is, how many acres are we talking about logging? Well, Your Honor, I respectfully disagree with that. I think that the scale of the project bears very much on irreparable harm because in a case like this, if AWR's members can enjoy this area of the forest undisturbed on the other 24,000 acres of burnt, dead and dying timber, I think... Okay, I got it. Thank you. In terms of irreparability, Your Honor, that's all I'm saying. That certainly has to, I would think, factor into the question. Also, please keep in mind that it's not as if the 1,600 areas that are going to be treated are going to be completely clear-cut. These are specific, as explained in the EEA, they're specific cutting units. Some are as small as three acres. Some are as large as 300 acres. The larger ones are permissible under the governing forest plan. Okay. But your argument was basically as to whether there was irreparable harm. I'm sorry to have detained you so long. Thank you. Thank you. Response? Thank you, Your Honor. I just have a couple of brief responses, mostly in response to Judge Raulston's questions about the regulation regarding requiring exhaustion. No, no. My question was whether or not there's a regulation that says the decision is not final until the appeal is exhausted. Right. And that I would direct your attention to two places. There's one, 217.16E, which says the reviewing officer's decision, and this is in our brief and also in the regulations, that the reviewing officer is the individual who is reviewing, and this gets complicated, the deciding officer's decision. So the reviewing officer is reviewing administrative appeals of the record of decision. So the reviewing officer's decision is the final administrative decision of the Department of Agriculture, and that decision is not subject to further review under this part. But how do you respond to opposing counsel's reference to the other portions of the regulation that talk about there should be no stay and that the decision can be implemented? Right. And what I would say is that we need to read that whole regulation actually in context. And he's talking about 217.10, which is stays. And it does say that, and this is sub-A, requests to stay the approval of force plans prepared pursuant to this part shall not be granted. However, requests to stay implementation of a project or activity included in such a plan will be considered as provided for in paragraph B. And it's important to note that the Rat Creek project was not a project included in the plan. It was outside of the plan process. That was one of your questions about was an appeal or a request for stay for this project filed. The answer is no, because this project, the Rat Creek project, was not a project considered in the revised plan. So there was no stay of the project filed. But the other question about whether or not plans have to, or we have to exhaust the administrative remedies on plans, I direct you to 217.18, which says policy in the event of judicial proceedings. And it says that it's the Department, it's the position of the Department of Agriculture that any filing for federal judicial review of a decision subject to review under this part is premature and inappropriate unless the plaintiff has first thought to invoke and exhaust the procedures available under this part. Right. We understand that, but that doesn't necessarily equate with a state of the decision. Correct. What's your response to opposing counsel's observation that you did not challenge the adequacy of the district court's explanation in its ruling? I have two responses to that. One is that on page 14 of our blue brief, we do set out the standard of review for this court and mention that if the district court did not apply the law, the requisite law, then that is a matter for judicial review for this court. She didn't flesh out that argument specifically vis-a-vis the brevity of the decision. No, Your Honor, that is true. We did not spend any time in the brief or much time in the brief talking about that, but I would also note that this court has de novo review of district court decisions such as these. And so we didn't spill a lot of ink on it because there wasn't a lot to talk about. And what was your second reason? De novo review of district court decisions and administrative review cases. About a preliminary injunction, is it de novo review? Yes. Can I ask a question about irreparable harm then? Yes, Your Honor. It is possible, isn't it, for the harm to be so small to an area that you claim enjoyment of as to not fit within either irreparable harm or at least for the harm tipping sharper in your favor. If you have, for example, a burn area, the Rat Creek Burn, or it could be a valley, and the proposed government action was to take out a single tree, you'd lose the opportunity to argue that your enjoyment of that area undisturbed had been significantly impacted in any way that led to irreparable harm to you by that action, wouldn't you? I think that you could. I guess it really ultimately depends on the facts. What I'm trying to get at is that it is possible to have a proposed action that's too small in comparison to the area you're enjoying, you claim enjoyment of, to matter. If you claim enjoyment of a herd of wild mustangs and the government wants to kill one of them, then you still can enjoy the herd of wild mustangs. How do we decide where that harm adds up enough to no longer be de minimis for our purposes? I think that we did address this issue in our brief talking about the scale of analysis. We said that the government had improperly enlarged the scale of analysis, but what's wrong with calling the scale of analysis here the burn, the area of the burn? We don't take issue with the geographic scope that the agency decided to analyze. Well, you did. You said they'd improperly enlarged it. They'd improperly enlarged it from what appropriate baseline? Well, let me take a step back because there's a possible legal claim that we didn't raise that talks a little bit about what you're discussing, but I understand what you're asking. Our response is that what we are talking about and our harm that we are claiming is from the 1,200-plus acres that will actually be harvested. That's in connection with your claimed enjoyment in its undisturbed state of the Rat Creek burn area. Right, including the areas that will be harvested. That's a little tautologicalism. If you claim enjoyment of the precise area of the government action, then you'll always claim enjoyment of precisely what the government wants to take. But what's wrong with the government saying, well, this is just a piece of a larger picture? Because the case law requires us to focus our analysis on the actual, and this is the Lujan case and it goes to standing and that sort of thing, that plaintiffs need to show use and enjoyment of the area that is actually affected by the agency's action. So you claim undisturbed enjoyment of the acres the government wants to harvest but make no claim about undisturbed enjoyment of the acres next to it that the government doesn't want to harvest? Your enjoyment is of the precise acreage the government wants to harvest? That's part of it, yes. Because we are harmed by that intact area being disturbed in parts. Why wouldn't that allow a similar claim that my enjoyment is of the horse the government wants to kill, not of the wild Mustang herd that I enjoy? I think then, in that example, it may depend on how you plead your harm. If your harm is of the herd versus each individual horse, I think that I could see where a claim could lie where I like that particular black horse and that's the one that the agency wants to take. I could see that claim being made. In this particular case, we don't have a situation where the government only wants to harvest one tree. They want to take 1,200 acres worth of forest habitat that the clients want to or my clients use and enjoy in its undisturbed state. Counsel, if I told you that our precedent dictates that we review a denial of preliminary injunction for abuse of discretion, how does that change your argument regarding the adequacy of the district court's reasoning? In response to that, Your Honor, I would say that because there was no – the district court's opinion spent a lot of time talking about the facts and how we got here, but there is no analysis about how we fail under the winter test, which is the test that the district court looked at. So the abuse of discretion there is that there is no – there's no – the district court did not go through any of the four factors. There was no balancing. There was no discussion about the actual merits and whether or not we demonstrated likely success on the merit. There was no discussion about irreparable harm. There was no balancing the equities and there was no discussion about the injunction in the public interest. And so without those sorts of discussions, the district court did abuse its discretion. I want to follow up on Judge Mossman's question about enjoyment of these particular acres. There's a certain artificiality about the enjoyment talk here that I think is built into the case law and there's no escape from it. But virtually no hiker in his or her right mind enjoys hiking through burned-off land. If your members spend a lot of time in the burn area, it's not because they like being out in the bright sunshine because they have lots of cover and so on. Every hiker I know prefers the deep forest instead of the burned-off area. So I don't think we're really talking about spending a lot of time enjoying themselves in the burn area. They never do. It's a broader, almost more abstract sense of enjoyment. Maybe you could call it aesthetic enjoyment. I live near the forest. I want to know that it is recuperating in what I think is its natural state and so on. And there's environmental harm that I feel aesthetically and so on. So I think to talk about your members actually walking through, having picnics, hiking in the burn area that's logged or not logged doesn't really get to the center of it for me. Do you have any response to that? I have a couple responses. One is that in our declarations, we do talk about actually spending time out in the burn. And in fact, I know in my home state of Oregon, there's actually a pretty vibrant tourist economy around burns for birders who come to burn areas to work on their bird list because there are certain kinds of birds that only utilize burn areas, for example. Oh, okay. So I may be wrong then. Okay. So I think that, and we do, my declarants do talk about that in their declarations, about actually enjoying the actual burn area. And some people take interest in looking at the burn areas for scientific reasons or for other reasons to document what's happened. That's right. And photograph it. And I'd use Yellowstone as a good example of that sort of enjoyment of nature's process. Okay. Thank you. Thank you. Thank you very much. I'm sorry that we would detain both of you so long, but this is both an important and difficult case. And we thank both sides for very nice arguments. Okay. The case of our alliance for the Wild Rockies versus Cottrell is now submitted for decision and we're in adjournment until tomorrow morning. Thank you.
judges: Mosman, Fletcher W. , Rawlinson